315 F.3d 338
 EMPAGRAN S.A., et al., Appellants,
v.
F. HOFFMAN-LAROCHE, LTD., et al., Appellees.
 No. 01-7115.
 United States Court of Appeals, District of Columbia Circuit.
 Argued September 9, 2002.
 Decided January 17, 2003.
 
 Appeal from the United States District Court for the District of Columbia (No. 00cv01686).
 Paul T. Gallagher argued the cause for appellants. With him on the briefs were Michael D. Hausfeld and Deborah J. Vogins. Ann C. Yahner entered an appearance.
 Charles S. Duggan argued the cause for appellees. With him on the brief were Arthur F. Golden, Bruce L. Montgomery, Stephen Fishbein, Tyrone C. Fahner, Andrew S. Marovitz, John M. Majoras, Lawrence Byrne, Michael L. Denger, D. Stuart Meiklejohn, Laurence T. Sorkin, Roy L. Regozin, Paul P. Eyre, Marcia E. Marsteller, Donald I. Baker, W. Todd Miller, Alice G. Glass, Peter E. Halle, Thomas J. Lang, James R. Weiss, Elizabeth W. Fleming, Craig M. Walker, Fred W. Reinke, Thomas M. Mueller, Michael O. Ware, Aileen Meyer, Sutton Keany, Bryan Dunlap, Martin Frederic Evans, Karen N. Walker, Moses Silverman, Kevin R. Sullivan, and Jeffrey S. Bucholtz. Thomas S. Martin, Kate Usdrowski, Matthew Solum, Carl W. Riehl and John S. Kiernan entered appearances.
 Before: EDWARDS, HENDERSON, and ROGERS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 Dissenting opinion filed by Circuit Judge KAREN LECRAFT HENDERSON.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 The action in this case was filed under section 1 of the Sherman Act, 15 U.S.C. § 1, sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15 and 26, the antitrust laws of foreign nations, and international law, on behalf of all foreign purchasers of certain vitamins, vitamin premixes, and bulk vitamin products and precursors, against a number of corporations, both foreign and domestic, who distribute and sell these vitamin products around the world. Appellants contend that appellees engaged in an over-arching worldwide conspiracy to raise, stabilize, and maintain the prices of vitamins; that this cartel operated on a global basis and affected virtually every market where appellees operated worldwide; and that appellees' unlawful price-fixing conduct had adverse effects in the United States and in other nations that caused injury to appellants in connection with their foreign purchases of vitamin products. Appellees moved to dismiss the action in the District Court, asserting that the court lacked subject matter jurisdiction under the federal antitrust laws, because the injuries plaintiffs sought to redress were allegedly sustained in transactions that lack any direct connection to United States commerce. The District Court granted the motion to dismiss and appellants now appeal.
 
 
 2
 This appeal requires us to interpret the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, to determine the jurisdictional reach of the federal antitrust laws. FTAIA, which amended the Sherman Act, provides that the Sherman Act "shall not apply to conduct" involving trade or commerce with foreign nations unless "such conduct has a direct, substantial, and reasonably foreseeable effect" on trade or commerce in the United States, and "such effect gives rise to a claim" under the provisions of the Sherman Act. Section 6a(1) of FTAIA makes it clear that our federal antitrust laws regulate foreign conduct only where that conduct has the proscribed "effects" on domestic or foreign United States commerce. And § 6a(2) of FTAIA provides that the antitrust laws are inapplicable unless the effect of extraterritorial conduct on United States commerce "gives rise to a claim" under the Sherman Act. The District Court held that, under FTAIA, a plaintiff must establish that the injuries it seeks to remedy actually arose from the anticompetitive effects of the defendants' conduct on United States commerce. In other words, it is not enough for a plaintiff to show that other persons were injured by such United States effects; the United States effects themselves must give rise to plaintiff's claim. This restrictive view of FTAIA's jurisdictional reach finds support in the Fifth Circuit. See Den Norske Stats Oljeselskap As v. HeereMac Vof, 241 F.3d 420 (5th Cir.2001).
 
 
 3
 Appellants contend that the District Court misconstrued FTAIA. According to appellants, FTAIA applies to "conduct" that has a "direct, substantial, and reasonably foreseeable effect" on United States commerce, if — not merely to the extent that — the requisite United States effects are found. Thus, according to appellants, Congress did not limit jurisdiction to "the same claim" as that on which the jurisdictional effects are based. Rather, Congress provided only that "a" claim cognizable under the Sherman Act must exist. Once a jurisdictional nexus exists, FTAIA does not limit the types of plaintiffs who may seek relief. Thus, according to appellants, it does not matter that the transactions in which they purchased vitamins took place outside of United States commerce. This less restrictive view of FTAIA's jurisdictional reach finds support in the Second Circuit. See Kruman v. Christie's Int'l PLC, 284 F.3d 384 (2d Cir.2002).
 
 
 4
 In the alternative, appellants claim that their complaint states a viable cause of action even under the District Court's restrictive view of FTAIA. Appellants contend that appellees caused injury to purchasers outside of the United States as a result of the anticompetitive effects of price changes and supply shifts in United States commerce. Not only was United States commerce directly affected by the worldwide conspiracy, appellants say, but the cartel raised prices around the world in order to keep prices in equilibrium with United States prices in order to avoid a system of arbitrage. Thus, according to appellants, the "fixed" United States prices acted as a benchmark for the world's vitamin prices in other markets. On this view of the alleged facts, appellants claim that the foreign plaintiffs were injured as a direct result of the increases in United States prices even though they bought vitamins abroad. The District Court did not address this alternative theory of jurisdiction. Neither the Second Circuit nor the Fifth Circuit embrace this view of FTAIA's jurisdictional reach, nor do we. In light of our disposition in favor of appellant on other grounds, we find it unnecessary to address this "alternative" theory of subject matter jurisdiction.
 
 
 5
 We can find no "plain meaning" in § 6a(2) of FTAIA. Nor do we find any easy resolution of this case by reference to the decisions of the Second and Fifth Circuits. The majority opinion in Den Norske Stats Oljeselskap As v. HeereMac Vof seems to us to endorse a view of FTAIA that is overly rigid, in light of the words of the statute and relevant portions of the legislative history. And, as we explain below, the opinion in Kruman v. Christie's International PLC seems to reach too far in its view of subject matter jurisdiction. Our view of the statute falls somewhere between the views of the Fifth and Second Circuits, albeit somewhat closer to the latter than the former.
 
 
 6
 We hold that where the anticompetitive conduct has the requisite harm on United States commerce, FTAIA permits suits by foreign plaintiffs who are injured solely by that conduct's effect on foreign commerce. The anticompetitive conduct itself must violate the Sherman Act and the conduct's harmful effect on United States commerce must give rise to "a claim" by someone, even if not the foreign plaintiff who is before the court. Although the language of § 6a(2) does not plainly resolve this case, we believe that our holding regarding the jurisdictional reach of FTAIA is faithful to the language of the statute. We reach this conclusion not only by virtue of our literal reading of the statute, but also in light of the statute's legislative history and underlying policies of deterrence emanating from the Supreme Court's decision in Pfizer, Inc. v. Government of India, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978).
 
 
 7
 Because the foreign plaintiffs here have alleged that the United States effects of appellees' cartel give rise to antitrust claims by parties injured in the United States from transactions occurring in the United States, we hold that subject matter jurisdiction is proper. We also find that appellants have standing to sue under the antitrust laws. We therefore reverse the District Court's decision, vacate the judgment against appellants, and remand the case for further proceedings consistent with this opinion.
 
 I. BACKGROUND
 
 8
 Section 1 of the Sherman Act makes unlawful "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations...." 15 U.S.C. § 1. Section 4 of the Clayton Act confers a cause of action on "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," and provides for treble damages. Id. § 15(a). Section 16 of the Clayton Act entitles "[a]ny person, firm, corporation or association ... to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws...." Id. § 26. In 1982, Congress enacted FTAIA, which amended the Sherman Act to make the Sherman Act inapplicable to non-import foreign commerce unless the conduct has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, and "such effect gives rise to a claim under" the Sherman Act. Id. § 6a. The text of FTAIA provides, in full:
 
 
 9
 Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless —
 
 
 10
 (1) such conduct has a direct, substantial, and reasonably foreseeable effect —
 
 
 11
 (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
 
 
 12
 (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
 
 
 13
 (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.
 
 
 14
 If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.
 
 
 15
 
 Id.
 
 
 
 16
 Appellees ("vitamin companies") are manufacturers and distributors of vitamins and vitamin products. Appellants ("foreign purchasers" or "foreign plaintiffs") are foreign corporations domiciled in various foreign countries, who purchased vitamins abroad from the vitamin companies or their alleged co-conspirators from January 1, 1988 to February 1999, for delivery outside the United States. The plaintiffs in this case originally filed a class action suit on behalf of foreign and domestic purchasers of vitamins, alleging "a massive and long-running conspiracy" among the vitamin companies and their co-conspirators "with the purpose and effect of fixing prices, allocating market share, and committing other unlawful practices designed to inflate the prices of various vitamins ... sold to the Plaintiffs and other purchasers both within and outside the United States." Amend. Compl. at ¶ 1, Joint Appendix ("J.A.") 15-16. The plaintiffs sought injunctive relief and damages under § 1 of the Sherman Act; §§ 4 and 16 of the Clayton Act; the antitrust laws of relevant foreign nations; and international law. Id. at ¶ 7, J.A. 19.
 
 
 17
 The vitamin companies moved to dismiss the suit as to the foreign plaintiffs pursuant to FED.R.CIV.P. 12(b)(1) for lack of subject matter jurisdiction under the federal antitrust laws, and for lack of standing under the federal antitrust laws. They also urged the District Court to decline to exercise supplemental jurisdiction over the foreign law claims, and to dismiss the international law claims for failure to state a claim upon which relief may be granted. The District Court held that it lacked subject matter jurisdiction under FTAIA over the foreign plaintiffs' claims. See Empagran S.A. v. F. Hoffman-La Roche, Ltd., 2001 WL 761360, at 2-4 (D.D.C. June 7, 2001). The "critical question in this case," the District Court stated, "is whether allegations of a global price fixing conspiracy that affects commerce both in the United States and in other countries gives persons injured abroad in transactions otherwise unconnected with the United States a remedy under our antitrust laws." Id. at 2. The District Court held that, because the conspiracy's effect on U.S. commerce did not cause the foreign purchasers' injury, the court did not have jurisdiction over the foreign purchasers' claims. See id. at 2-4.
 
 
 18
 Because the District Court dismissed the foreign purchaser's federal claims for lack of subject matter jurisdiction, it found that it did not need to reach the issue of standing with respect to the foreign plaintiffs. See id. at 5. The District Court declined to exercise supplemental jurisdiction over the foreign purchasers' foreign law claims, because "these foreign law claims raise novel and complex issues of foreign law, the court has already dismissed all federal claims brought by the foreign plaintiffs for lack of subject matter jurisdiction," and because of "comity and efficiency reasons." Id. at 8. Finally, the District Court dismissed the foreign purchasers' claims under customary international law for failure to state a claim, because the court could not find the existence of a customary international law proscribing the conduct alleged. See id. at 9. The foreign purchasers filed an interlocutory appeal.
 
 
 19
 At the time of its decision, the District Court deferred ruling on the defendants' motion to dismiss the domestic plaintiffs' federal antitrust claims, and directed the domestic plaintiffs to supplement their complaint to provide more detailed factual allegations. Id. at 4, 6. At the suggestion of the District Court, for practicality, see id. at 7 n. 5, the domestic plaintiffs in the case subsequently entered into a court-approved stipulation that transferred their claims to another action pending before the District Court, Procter & Gamble Co. v. BASF AG, No. 99-3046 (M.D.L. No. 1285), which involved similar claims against substantially the same defendants. The parties thereby agreed that the domestic plaintiffs had no pending claims in the instant case. On September 10, 2001, the District Court granted the defendants' motion for an order directing entry of final judgment, and on April 26, 2002, the District Court entered final judgment for the defendants in the instant case. The foreign plaintiffs' appeal is therefore no longer interlocutory.
 
 II. ANALYSIS
 A. Subject Matter Jurisdiction
 
 20
 This court reviews de novo the District Court's dismissal of a complaint for lack of subject matter jurisdiction. Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1432 (D.C.Cir.1995). A complaint may be dismissed for lack of subject matter jurisdiction only if "`it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Sinclair v. Kleindienst, 711 F.2d 291, 293 (D.C.Cir. 1983) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957)). In our review, this court assumes the truth of the allegations made and construes them favorably to the pleader. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).
 
 
 21
 In this case, the foreign purchasers, who bought vitamins exclusively outside the United States, allege that the vitamin companies conspired to fix vitamin prices around the world, and that the foreign purchasers paid inflated prices for vitamins abroad as a result of the global conspiracy. FTAIA makes the Sherman Act inapplicable to conduct in foreign commerce unless the conduct has "a direct, substantial, and reasonably foreseeable effect" on domestic commerce and "such effect gives rise to a claim under" the Sherman Act. See 15 U.S.C. § 6a(1).
 
 
 22
 As an initial matter, the parties appear to dispute the scope of the "conduct" that should be considered for our FTAIA analysis. Essentially, appellants argue that the relevant conduct is the "massive international cartel, exercising global market power." Appellants' Br. 19. Appellees argue that the relevant conduct is solely the market transactions between them and the foreign plaintiffs overseas. Appellees' Br. 20-21. Both the Second and Fifth Circuits have adopted appellants' approach, and appellants' approach is correct. See Kruman, 284 F.3d at 398; Den Norske, 241 F.3d at 426. Indeed, the Kruman court rejected a narrow definition of "conduct" as "[t]he precise acts that caused injury," and instead adopted a broader definition of "conduct" as "acts that are illegal under the Sherman Act," that is, the international price-fixing conspiracy. Kruman, 284 F.3d at 398. The complaint in this case alleges an international price-fixing conspiracy among the vitamin companies, and appellees "do not contest that the vitamin cartel produced substantial effects in the United States" for the purpose of this appeal. Oral Argument Transcript, at 30-31. In light of this concession by appellees, it is unnecessary for us to explore further the precise parameters of the definition of "conduct," since there is no real dispute that the vitamin companies' conduct had "a direct, substantial, and reasonably foreseeable effect" on U.S. commerce. We therefore accept that the "direct, substantial, and reasonably foreseeable effect" requirement under § 6a(1) of FTAIA is met. Additionally, in light of appellees' concession that the vitamin cartel produced substantial effects on U.S. commerce, it is unnecessary for us to address appellees' argument that regulating foreign business transactions would exceed the powers granted to Congress under the Commerce Clause. See Appellees' Br. 16-17.
 
 
 23
 The precise issue presented in this appeal is whether the "gives rise to a claim" requirement under § 6a(2) of FTAIA authorizes subject matter jurisdiction where the defendant's conduct affects both domestic and foreign commerce, but the plaintiff's claim arises only from the conduct's foreign effect. In other words, the question is whether FTAIA precludes actions under the Sherman Act unless a plaintiff shows that the injuries it seeks to remedy arise from the anticompetitive effects of the defendant's conduct on U.S. commerce; or, alternatively, is it enough for a plaintiff to show that the anticompetitive effects of the defendant's conduct on U.S. commerce give rise to an antitrust claim under the Sherman Act by someone, even if not the plaintiff who is before the court.
 
 
 24
 The Supreme Court first addressed the foreign reach of the Sherman Act in American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909) (Holmes, J.), which held that the Sherman Act did not apply to conduct occurring outside the United States. Eighteen years later, the Court moderated this approach, and held that the Sherman Act authorized jurisdiction over foreign defendants, as long as some of the defendants' conduct occurred within the United States and the conduct affected domestic commerce. See United States v. Sisal Sales Corp., 274 U.S. 268, 275-76, 47 S.Ct. 592, 593-94, 71 L.Ed. 1042 (1927).
 
 
 25
 In 1945, in an important opinion by Judge Learned Hand, the Second Circuit held that a federal court has jurisdiction over foreign conduct as long as the conduct was intended to, and actually did, affect U.S. commerce. See United States v. Aluminum Co. of Am., 148 F.2d 416, 443-44 (2d Cir.1945) ("Alcoa"). Judge Hand said that a "state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends." Id. at 443. Under Alcoa, jurisdiction depends upon whether the conduct had an effect on domestic commerce, not where the conduct took place. "[C]onduct which has no consequences within the United States" does not come within the reach of U.S. antitrust laws. Id. Alcoa's "effects test" is now well accepted. See, e.g., Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 922 (D.C.Cir.1984) ("It has long been settled law that a country can regulate conduct occurring outside its territory which causes harmful results within its territory."); see also IA PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 270, at 336 (2d ed.2000) ("The central point, now well established, is that conduct, whether at home or abroad, can be reached by our antitrust laws when it affects competition within the United States or export competition from the United States."). The Supreme Court expressly embraced the "effects test" in Hartford Fire Insurance Co. v. California, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), stating that "it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." Id. at 796, 113 S.Ct. at 2909 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582 n. 6, 106 S.Ct. 1348, 1354 n. 6, 89 L.Ed.2d 538 (1986); Alcoa, 148 F.2d at 444).
 
 
 26
 In 1982, Congress enacted FTAIA, to "encourage the business community to engage in efficiency producing joint conduct in the export of American goods and services." H.R.REP. No. 97-686, at 2 (1982). As the Supreme Court has noted, "FTAIA was intended to exempt from the Sherman Act export transactions that did not injure the United States economy." Hartford Fire Ins., 509 U.S. at 796-97 n. 23, 113 S.Ct. at 2909 n. 23 (citations omitted). FTAIA was also passed to enact a "single, objective test — the `direct, substantial, and reasonably foreseeable effect' test" that "will serve as a simple and straightforward clarification of existing American law ...." H.R.REP. No. 97-686, at 2. FTAIA thus endorsed Alcoa's "effects test." See id. at 5 ("Since Judge Learned Hand's opinion in [Alcoa], it has been relatively clear that it is the situs of the effects as opposed to the conduct, that determines whether United States antitrust law applies.").
 
 
 27
 Since the enactment of FTAIA, the D.C. Circuit has had one occasion to apply the statute. In Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC, 148 F.3d 1080, 1086-87 (D.C.Cir.1998), the court considered whether FTAIA authorizes subject matter jurisdiction over a Caribbean radio station's claim that a competing Caribbean radio station violated the Sherman Act by falsely telling U.S. advertisers that its own radio signal reached the entire Eastern Caribbean so that the advertisers would believe that it alone could fulfill their advertising needs. The precise question was whether the complaint by a foreign plaintiff against a foreign defendant adequately alleged that the latter's anticompetitive conduct had a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce, as required by FTAIA's first prong. This court found that the anticompetitive conduct of the defendant radio station harmed the U.S. advertisers who had to pay higher prices because of it. We stated: "In this context it appears that antitrust injury to [the plaintiff] is ultimately a harm to U.S. purchasers of radio advertising. By keeping [the plaintiff] out of the market, [the defendant] denied such purchasers the benefit of competition." Id. Thus, we held that FTAIA authorized subject matter jurisdiction in that case.
 
 
 28
 The decision in Caribbean did not expressly address FTAIA's second prong — requiring that the effects of the anticompetitive conduct on U.S. commerce "give[] rise to a claim under" the antitrust laws — which is at issue in the instant appeal. However, in the course of addressing the first prong's "direct, substantial, and reasonably foreseeable effect" requirement, the Caribbean decision noted that the foreign radio station's "antitrust injury ... is ultimately a harm to U.S. purchasers of radio advertising." Id. This conclusion followed from the facts of that case, in which the foreign company's injury and the U.S. purchasers' injury were two sides of the same coin: the defendant radio station's false representations to its U.S. advertisers had the effect of misleading the U.S. advertisers, and causing them to buy advertising from the false advertiser at inflated prices; these purchases based on false information were what shut the plaintiff radio station out of the advertising market. Thus, it is possible to read Caribbean to have assumed, on the facts of that case, that the effect of the conduct on U.S. commerce gave rise to the plaintiff's claim. If so, Caribbean simply did not address the question at issue in the instant case, where the effect of the vitamin companies' conduct on U.S. commerce does not give rise to the plaintiffs' claim for redress.
 
 
 29
 There is another equally plausible way to read the Caribbean decision. Although the foreign plaintiff's loss of opportunity to sell advertising and the higher prices paid by U.S. advertisers were clearly interrelated, the higher prices paid by U.S. advertisers did not cause or give rise to the foreign plaintiff's loss of opportunity to sell advertising. One then could not say that the U.S. effect "gave rise to" the plaintiff's claim. It is thus possible that Caribbean impliedly interpreted the "gives rise to a claim" prong of FTAIA to be satisfied even where the U.S. effect does not "give rise to" the foreign plaintiff's claim.
 
 
 30
 We need not determine which of these two readings of FTAIA's second prong is implied by Caribbean. Both interpretations appear plausible. Compare, e.g., Den Norske, 241 F.3d at 430 ("[T]he effect on United States commerce in [Caribbean]... gave rise to the injury suffered by the plaintiff, a competing radio station — that is, exclusion of the plaintiff from the market for United States advertising dollars."), with id., 241 F.3d at 436-37 (Higginbotham J, dissenting) ("[Caribbean] did not require that the injury to American advertisers `give[] rise to' the plaintiff's cause of action; its determination that the injury gave rise to `a' claim was sufficient."). In any event, because Caribbean only addressed FTAIA's "direct, substantial, and reasonably foreseeable effect" prong, we hesitate to derive a firm interpretation of the "gives rise to a claim" prong from that case. The law of the circuit thus leaves unanswered the question whether FTAIA requires that the plaintiff's claim arise from the U.S. effect of the anticompetitive conduct. This is an issue of first impression in this circuit.
 
 1. Circuit Split
 
 31
 As noted above, the Second and Fifth Circuits have split on this very question of statutory interpretation. The District Court in the instant case followed the Fifth Circuit's Den Norske decision, which held that the federal antitrust laws do not apply to claims in which the plaintiff's injury does not arise from the conspiracy's anticompetitive domestic effect. Den Norske, 241 F.3d at 427. That is, even if a conspiracy results in higher prices in the United States, that domestic effect must "give rise to" the plaintiff's injury. By contrast, the Second Circuit in Kruman held that FTAIA allows suit by a plaintiff whose injury does not arise from the conduct's harm to domestic commerce, as long as that conduct's "domestic effect violate[d] the substantive provisions of the Sherman Act." Kruman, 284 F.3d at 400. As in the instant case, the "direct, substantial, and reasonably foreseeable effect" prong of § 6a(1) was satisfied in those two cases, and the question at issue was whether the "gives rise to a claim" prong of § 6a(2) was satisfied where the U.S. effect of the conduct did not give rise to the plaintiff's claim.
 
 
 32
 In the Fifth Circuit's Den Norske case, a Norwegian oil corporation conducting business exclusively in the North Sea brought an antitrust conspiracy claim against providers of heavy-lift barge services, alleging that the defendants' conduct inflated the plaintiff's operating costs in the North Sea and also inflated oil prices in the U.S. market. The majority opinion in Den Norske interpreted the "gives rise to a claim" prong as demanding that the domestic effect give rise to the plaintiff's claim, not merely to someone's claim. Den Norske, 241 F.3d at 427. Because the plaintiff's injury arose solely from the foreign effect, and not from the domestic effect of the defendant's conduct, the Fifth Circuit found subject matter jurisdiction lacking.
 
 
 33
 Judge Patrick Higginbotham dissented, writing that he was "not persuaded that when illegal conduct produces these domestic effects, that Congress intended to close the door to a foreign company injured by the same illegal conduct." Id. at 431 (Higginbotham J., dissenting). Judge Higginbotham found that the literal text of the words "gives rise to a claim" supported jurisdiction: "The word `a' has a simple and universally understood meaning. It is the indefinite article .... If the drafters of FTAIA had wished to say `the claim' instead of `a claim,' they certainly would have." Id. at 432. In light of the purpose of FTAIA "to exempt exporting from antitrust scrutiny, not to limit the liability of participants in transnational conspiracies that affect United States commerce," Judge Higginbotham worried that the majority's "interpretation of the FTAIA transforms a safe harbor for American exporters into a boon for foreign cartels that restrain commerce in the United States." Id. at 433, 434. Judge Higginbotham emphasized the deterrence rationale animating the Sherman and Clayton Acts, and feared that global conspiracies that affect U.S. commerce could be inadequately deterred in the absence of suits by foreign plaintiffs:
 
 
 34
 Conspirators facing antitrust liability only to plaintiffs injured by their conspiracy's effects on the United States may not be deterred from restraining trade in the United States. A worldwide price-fixing scheme could sustain monopoly prices in the United States even in the face of such liability if it could cross-subsidize its American operations with profits from abroad. Unless persons injured by the conspiracy's effects on foreign commerce could also bring antitrust suits against the conspiracy, the conspiracy could remain profitable and undeterred.
 
 
 35
 Id. at 435.
 
 
 36
 In the Second Circuit's Kruman case, buyers and sellers at foreign auctions filed suit against the two largest auction houses, Christie's and Sotheby's, alleging that the auction houses had conspired to fix prices in the United States and abroad for their services as auctioneers, and had inflated commissions. In addressing this claim, the Second Circuit explained that FTAIA is an amendment to the Sherman Act, rather than to the Clayton Act, and, as such, focuses only on the prohibition of a defendant's anticompetitive conduct, rather than on what injury a plaintiff must suffer to bring suit. Thus, the court reasoned, the argument that FTAIA limits liability to injury arising out of the conduct's domestic effect conflates the Clayton Act, to which a plaintiff's injury is relevant, and the Sherman Act, to which only a defendant's conduct is relevant. See Kruman, 284 F.3d at 397-99. The court then interpreted the "gives rise to a claim" language as requiring only "that the domestic effect violate the substantive provisions of the Sherman Act," rather than "that the domestic effect give rise to an injury that would serve as the basis for a Clayton Act action." Id. at 400. The Second Circuit read Congress' use of the indefinite article in "gives rise to a claim" to mean that "[t]he `effect' on domestic commerce need not be the basis for a plaintiff's injury, it only must violate the substantive provisions of the Sherman Act." Id.
 
 
 37
 The Second Circuit also relied on policy considerations in interpreting FTAIA. In line with its view that FTAIA governs what conduct by a defendant is regulated by the Sherman Act, rather than which plaintiffs can bring suit, the court reasoned that
 
 
 38
 when anticompetitive conduct is directed at both foreign and domestic markets, the success of an anticompetitive scheme in foreign markets may enhance the effectiveness of an anticompetitive scheme in the domestic market. When a foreign scheme magnifies the effect of the domestic scheme, and plaintiffs affected only by the foreign scheme have no remedy under our laws, the perpetrator of the scheme may have a greater incentive to pursue both the foreign scheme and the domestic scheme rather than the domestic scheme alone. Our markets suffer when the foreign scheme is not deterred because the domestic scheme may have a greater chance of success when it is supplemented by the foreign scheme.
 
 
 39
 Id. at 403. Thus, the Second Circuit found that "[o]ur markets can benefit from the additional deterrence of conduct affecting foreign markets." Id. (citing Pfizer, 434 U.S. at 313-15, 98 S.Ct. at 587-89).
 
 
 40
 2. FTAIA's Language: "Effect" that "Gives Rise to a Claim"
 
 
 41
 Appellants' and appellees' arguments regarding the meaning of FTAIA's "gives rise to a claim" language largely correspond to the reasoning adopted in the Second Circuit's and the Fifth Circuit's opinions, respectively. On the Fifth Circuit's restrictive view of FTAIA, the statute allows suit only where the plaintiff is injured by the U.S. effects of the anticompetitive conduct. Den Norske, 241 F.3d at 427. On the Second Circuit's less restrictive view, the statute also allows suit where the plaintiff is injured in foreign commerce by anticompetitive conduct whose "domestic effect ... violates the Sherman Act," even if the domestic effect of the conduct does not injure the plaintiff. Kruman, 284 F.3d at 401.
 
 
 42
 Appellants make two arguments about the language of FTAIA that we reject. First, echoing the Second Circuit, appellants argue that the Fifth Circuit's restrictive interpretation of "gives rise to a claim" renders superfluous the concluding provision of FTAIA, which states that, if the Sherman Act applies only because the conduct affects "export commerce or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States," 15 U.S.C. § 6a(1)(B), then it applies "to such conduct only for injury to export business in the United States," id. § 6a. See Appellants' Br. 22-23; Kruman, 284 F.3d at 396; Den Norske, 241 F.3d at 432 n. 5 (Higginbotham, J., dissenting). In other words, if subsections 1 and 2 of FTAIA already provide that the Sherman Act applies only where the U.S. effect gives rise to the plaintiff's injury, why would Congress need to add the final proviso that, regarding injury to export commerce, the Sherman Act only applies to injury to U.S. export commerce?
 
 
 43
 We think that there is a reading of the final proviso of FTAIA that would not render it superfluous, even if one were to adopt the Fifth Circuit's and the District Court's restrictive interpretation of "gives rise to a claim." The final proviso could be intended to clarify that, although subsection 1(B) speaks of a "person engaged in" export commerce, the Sherman Act does not extend to all injury sustained by such a person as a result of the defendant's anticompetitive conduct, but, rather, only to injury to his export business sustained within the United States. In other words, the proviso precludes an exporter from suing for injury to some aspect of his export business suffered outside the United States. See IA AREEDA & HOVENKAMP, supra, ¶ 262, at 360 (explaining that the final proviso "is designed to make clear that a foreign firm operating an export business in the United States continues to be protected by the antitrust laws with respect to that business but not with respect to its operations outside the United States"). This limitation would not render the final proviso superfluous under an interpretation of subsection 2 requiring that the plaintiff be injured by the conduct's domestic effect to be able to sue.
 
 
 44
 Second, appellants place significance on the fact that, in providing that the Sherman Act shall not apply to foreign commerce "unless ... such conduct" has a U.S. effect that "gives rise to a claim," Congress chose the word "unless" rather than the phrase "except to the extent that." Appellants contend that "unless" enables the conduct itself to be actionable so long as the U.S. effect is present, whereas "except to the extent that" would make the Sherman Act apply only to the extent that the conduct that causes the U.S. effect also gives rise to the plaintiffs' claim. See Appellants' Br. 17-19. This is overreading. Like the District Court, we are unconvinced that "unless" and "to the extent that" would have such different meanings in this statute.
 
 
 45
 At bottom, however, we agree with appellants that § 6a(2) supports subject matter jurisdiction in this case. Although both the Second Circuit and the Fifth Circuit found the "gives rise to a claim" language of § 6a(2) to be plain in opposite ways, we find that the language does not clearly resolve the question whether "a claim" means the plaintiff's claim. The Fifth Circuit's view that "a claim" plainly refers to the plaintiff's claim must depart from the literal language — "gives rise to a claim" — and substitute the words "gives rise to the plaintiff's claim" in order to reach the plain meaning to which the court subscribes. The Second Circuit construes broadly Congress' use of the indefinite article in "a claim," such that "a claim" really means "civil action ... by the federal government to enforce or prevent a substantive violation of the Sherman Act pursuant to 15 U.S.C. § 4"; hence, the words "gives rise to a claim" mean that the conduct's domestic effect "only must violate the substantive provisions of the Sherman Act." Kruman, 284 F.3d at 399-400. We think that this interpretation of the words "a claim" gives short shrift to § 6a(2)'s explicit requirement that the domestic effect "give[] rise to a claim" — in other words, the language is far from clear as to whether that requirement can be satisfied merely by a violation of the Sherman Act, rather than by antitrust injury to the plaintiffs or others who could bring a claim under the provisions of the Clayton Act that create a cause of action for Sherman Act violations.
 
 
 46
 Our view of the statute falls somewhere between the views of the Fifth and Second Circuits, albeit somewhat closer to the latter than the former. We hold that, where the anticompetitive conduct has the requisite effect on United States commerce, FTAIA permits suits by foreign plaintiffs who are injured solely by that conduct's effect on foreign commerce. The anticompetitive conduct itself must violate the Sherman Act and the conduct's harmful effect on United States commerce must give rise to "a claim" by someone, even if not the foreign plaintiff who is before the court. Thus, the conduct's domestic effect must do more than give rise to a government action for violation of the Sherman Act, but it need not necessarily give rise to the particular plaintiff's (private) claim. This interpretation has the appeal of literalism. Cf. Den Norske, 241 F.3d at 432 (Higginbotham, J., dissenting) ("The word `a' has a simple and universally understood meaning.... If the drafters of FTAIA had wished to say `the claim' instead of `a claim,' they certainly would have.").
 
 
 47
 Although the language of § 6a(2) does not plainly resolve this case, we believe that our holding regarding the jurisdictional reach of FTAIA is a faithful to the language of the statute. We reach this conclusion not only by virtue of our literal reading of the statute, but also in light of the statute's legislative history and underlying policies of deterrence, which we address in parts A.4. and A.5., infra. We first consider the Second Circuit's structural argument in support of its less restrictive view of § 6a(2).
 
 3. FTAIA's Structure
 
 48
 Appellants adopt the Second Circuit's structural argument — namely that, because FTAIA amended the Sherman Act rather than the Clayton Act, FTAIA only speaks to the question what conduct is prohibited, not which plaintiffs can sue. See Appellants' Reply Br. 6-7; Kruman, 284 F.3d at 397-400. Because FTAIA is an amendment to the Sherman Act, this structural argument deems Congress in FTAIA to have addressed only the Sherman Act's prohibition of anticompetitive conduct, putting out of view the Clayton Act's conferral of a cause of action on those injured by Sherman Act violations. Appellants argue: "Since the focus of the FTAIA is on the defendants' conduct, which is regulated by the Sherman Act, it is this conduct alone that violates the Sherman Act. To require that the injury of domestic purchasers be the basis for the injury suffered by Plaintiffs ... improperly imports a concept applicable to Section 4 of the Clayton Act." Appellants' Reply Br. 6-7.
 
 
 49
 This argument is plausible but ultimately unconvincing. The Clayton Act, which gives plaintiffs a cause of action under the Sherman Act, was in effect at the time that FTAIA was enacted, and FTAIA speaks explicitly of "giv[ing] rise to a claim under" the Sherman Act. The concept of a claim arising under the Sherman Act is clearly one that is present in the Clayton Act's conferral of a cause of action on those injured by Sherman Act violations. It is thus equally plausible to think that Congress referred to both prohibited conduct and plaintiffs' injury, importing concepts from both the Sherman and Clayton Acts, in making the nexus of "conduct," "effect," and "claim" the key to FTAIA. The view that FTAIA must be taken to refer only to defendants' conduct tends to ignore the fact that FTAIA does refer on its face to the conduct's effect giving rise to a claim, which arguably refers to a plaintiff's injury. Congress may well have imported a concept from the Clayton Act in amending the Sherman Act, notwithstanding appellants' and the Second Circuit's assumption of categorical precision on Congress' part.
 
 
 50
 The Second Circuit's heavy reliance on this argument led to its rather expansive holding to the effect that: "Rather than require that the domestic effect give rise to an injury that would serve as the basis for a Clayton Act action, subsection 2 of the FTAIA only requires that the domestic effect violate the substantive provisions of the Sherman Act." Kruman, 284 F.3d at 400. According to the Second Circuit, "a violation of the Sherman Act is not predicated on the existence of an injury to a plaintiff. In fact, the only civil action that can be brought directly under the Sherman Act is one by the federal government to enforce or prevent a substantive violation of the Sherman Act pursuant to 15 U.S.C. § 4." Id. at 399. The Second Circuit thereby held that violation of the Sherman Act is sufficient to meet the "gives rise to a claim" requirement of subsection 2. In the Second Circuit's view, the words "a claim" in FTAIA mean an action by the government, not a private claim. The Second Circuit justified this view in a footnote, with three arguments: that the definition of the words "a claim" does not exclude this meaning, id. at 400 (citing BLACK'S LAW DICTIONARY 240 (7th ed.1999)); that FTAIA's specific reference to "a claim under the provisions of sections 1 to 7 of this title" means a claim brought directly pursuant to the Sherman Act, id.; and that Congress has not exclusively used the word "claim" to refer to a private action for damages, id. (citing the Federal Trade Commission Act, 15 U.S.C. § 45(a)(3), which gives the FTC "the power to enforce the substantive provisions of the FTCA regardless of whether a plaintiff has suffered injury").
 
 
 51
 While we acknowledge that the words "a claim" do not necessarily exclude a government action, the usual meaning of "a claim" is a private action. Thus, unlike the Second Circuit, we do not think that violation of the Sherman Act is necessarily the same thing as "giv[ing] rise to a claim" under it. Furthermore, the concept of "giv[ing] rise to a claim" may well be a concept from the Clayton Act, which creates a private cause of action for Sherman Act violations. As noted above, we believe that, in order to satisfy FTAIA, a plaintiff must show that the anticompetitive conduct violates the Sherman Act and that the conduct's U.S. effect gives rise to someone's claim under it. As the Second Circuit itself noted, "[t]he existence of a Sherman Act violation does not depend on whether anyone has actually suffered an injury. Conduct may violate the Sherman Act but not be actionable under section 4 of the Clayton Act because it did not cause injury." Kruman, 284 F.3d at 397 (citing Indiana Grocery, Inc. v. Super Valu Stores, Inc., 864 F.2d 1409, 1419 (7th Cir. 1989)). "The `mere presence' of a per se violation under Sherman Act § 1 `does not by itself bestow on any plaintiff a private right of action for damages,' which is a `gift of section 4 of the Clayton Act.'" II AREEDA & HOVENKAMP, supra, § 337c, at 313 (quoting Indiana Grocery, 864 F.2d at 1419). And "while actual injury is required to seek treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, a plaintiff may bring an antitrust action seeking prospective injunctive relief under section 16 of the Clayton Act for conduct violating the Sherman Act without suffering an actual injury." Kruman, 284 F.3d at 397 (citing 15 U.S.C. § 26; McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 243, 100 S.Ct. 502, 509-10, 62 L.Ed.2d 441 (1980); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969)). But the Sherman Act may be enforced by the government even when no private plaintiff claims actual or threatened injury. See 15 U.S.C. § 4 ("The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title; and it shall be the duty of the several United States attorneys ... to institute proceedings in equity to prevent and restrain such violations.").
 
 
 52
 We hold that the words "a claim" in subsection 2 of FTAIA refer to a private action, not merely a government action to enforce the Sherman Act. In other words, "giv[ing] rise to a claim" means giving rise to someone's private claim for damages or equitable relief. To satisfy this requirement, the plaintiff must allege that some private person or entity has suffered actual or threatened injury as a result of the U.S. effect of the defendant's violation of the Sherman Act. In the instant case, the conspiracy's U.S. effects did allegedly injure and did give rise to the claim of some private entities — namely the domestic plaintiffs who filed suit along with the foreign plaintiffs against the vitamin companies.
 
 4. Legislative History
 
 53
 Both appellants and appellees argue that FTAIA's legislative history supports their respective readings of the statute. Parts of the report from the House Committee that drafted FTAIA suggest that plaintiffs injured by the U.S. effects of the anticompetitive conduct may sue, which of course is consistent with the restrictive view of FTAIA's jurisdictional reach. However, there is much in the legislative history to suggest that foreign plaintiffs injured solely by the foreign effects of the anticompetitive conduct may sue, so long as the conduct also harms U.S. commerce. This legislative history supports the less restrictive view of FTAIA's jurisdictional reach, consistent with the position advanced by appellants and endorsed by the Second Circuit. What is most noteworthy is that the presence of legislative history that is consistent with the restrictive view does not (when read in context) denigrate or exclude the less restrictive view, whereas the less restrictive view includes within it the view that plaintiffs harmed by the U.S. effects can sue. This leads us to conclude that the legislative history as a whole supports the less restrictive interpretation of FTAIA that would allow plaintiffs injured by the conduct's foreign effects to bring suit even where the conduct's U.S. effects do not give rise to the plaintiff's claim.
 
 
 54
 Appellees argue that the following passage from the House Report demonstrates that Congress intended for the Sherman Act to apply only in cases where the plaintiff's injury arose from anticompetitive effect on U.S. commerce:
 
 
 55
 The Committee did not believe that the bill reported by the Subcommittee was intended to confer jurisdiction on injured foreign persons when that injury arose from conduct with no anticompetitive effects in the domestic marketplace. Consistent with this conclusion, the full Committee added language ... to require that the "effect" providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws. This does not, however, mean that the impact of the illegal conduct must be experienced by the injured party within the United States.... [I]t is sufficient that the conduct providing the basis of the claim has had the requisite impact on the domestic or import commerce of the United States....
 
 
 56
 H.R.REP. No. 97-686, at 11-12. This passage states that the U.S. "`effect' providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws," which is consistent with appellees' restrictive view that the plaintiffs' injury must arise from the conduct's U.S. effect. However, the sentences that immediately follow make clear that "it is sufficient that the conduct providing the basis of the claim has had the requisite impact on" U.S. commerce, which supports appellants' broader view of the statute's "gives rise to a claim" requirement. Indeed, the "[t]his does not, however, mean that the impact of the illegal conduct must be experienced by the injured party within the United States" language, which follows immediately after the discussion of the restrictive view, strongly suggests that Congress did not intend to exclude the less restrictive basis for subject matter jurisdiction under FTAIA.
 
 
 57
 Under the heading "Imports and Purely Foreign Transactions," the House Report states:
 
 
 58
 A transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws.... [T]here should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect on domestic commerce or a domestic competitor.... It is thus clear that wholly foreign transactions as well as export transactions are covered by the [FTAIA], but that import transactions are not.
 
 
 59
 Id. at 9-10. This passage also suggests that the restrictive view of the statute does not exclude the less restrictive interpretation. On the one hand, the antitrust laws do not extend to "wholly foreign transactions," such as a transaction between two foreign firms. On the other hand, when the passage is read as a whole, this restriction seems to be contemplated only where there is no "direct, substantial and reasonably foreseeable effect on domestic commerce." This implies that where there is such an effect, jurisdiction over foreign transactions is proper. This surely does not support appellees' view of the statute.
 
 
 60
 Parts of FTAIA's legislative history plainly support the broader view of the statute. For example, the House Report states that
 
 
 61
 the domestic "effect" that may serve as the predicate for antitrust jurisdiction... must be of the type that the antitrust laws prohibit.... For example, a plaintiff would not be able to establish United States antitrust jurisdiction merely by proving a beneficial effect within the United States, such as increased profitability of some other company or increased domestic employment, when the plaintiff's damage claim is based on an extraterritorial effect on him of a different kind.
 
 
 62
 H.R.REP. No. 97-686, at 11. The focus here seems to be on whether the conduct's domestic effect violates the antitrust laws, rather than on whether the conduct's domestic effect gives rise to the plaintiff's claim. This passage suggests that the plaintiff need only allege that the defendant's conduct actually had an effect on the domestic market and that such effect violated the antitrust laws. But more tellingly, in the course of explaining that a plaintiff whose "damage claim is based on an extraterritorial effect" cannot establish jurisdiction where the conduct has a "beneficial effect within the United States," the passage implicitly assumes that a plaintiff whose claim is based on a foreign effect can establish jurisdiction where the conduct has a harmful effect within the United States. This example addresses the situation in which the same conduct has both domestic and foreign effects, and clearly assumes that the plaintiff's claim does not arise from the conduct's U.S. effect. It specifies that the hypothetical beneficial U.S. effect could be "increased profitability of some other company or increased domestic employment," which obviously could not give rise to a claim under the antitrust laws. But significantly, this example does not assume that the fact that the claim arises from something other than the U.S. effect precludes subject matter jurisdiction. Rather, it is clearly the fact of the U.S. effect being beneficial — and therefore the absence of harmful effect under the "effect" prong — that would render jurisdiction improper. This passage thus suggests that the plaintiff can invoke jurisdiction where the anticompetitive conduct's U.S. effect does not give rise to the plaintiff's claim, as long as the conduct has a harmful, not beneficial, effect on U.S. commerce.
 
 
 63
 In another passage, the House Report states:
 
 
 64
 Any major activities of an international cartel would likely have the requisite impact on United States commerce to trigger United States subject matter jurisdiction. For example, if a domestic export cartel were so strong as to have a "spillover" effect on commerce within this country — by creating a worldwide shortage or artificially inflated world-wide price that had the effect of raising domestic prices — the cartel's conduct would fall within the reach of our antitrust laws. Such an impact would, at least over time, meet the test of a direct, substantial and reasonably foreseeable effect on domestic commerce.
 
 
 65
 H.R. REP. No. 97-686, at 13. This suggests that Congress intended for subject matter jurisdiction to exist over the conduct of an international cartel that had an effect on domestic commerce, even if the plaintiff's claim does not arise from that domestic effect. Again, the focus for subject matter jurisdiction purposes here is on whether the defendant's conduct has "the requisite impact on United States commerce," rather than whether the plaintiff in particular was injured by that impact. This passage's example of a domestic export cartel, which presumably directs its anticompetitive conduct to foreign markets, but whose conduct also has a "`spillover' effect on commerce within this country" exemplifies this point, because such a cartel's conduct would give rise to claims by foreign and domestic plaintiffs. In understanding the conduct of such a cartel to be likely to "fall within the reach of our antitrust laws," nothing in this passage restricts that reach to suits only by the domestic plaintiffs injured by the conduct's spillover effects. Admittedly, nothing in this passage explicitly allows suits by plaintiffs injured abroad by a "world-wide shortage or artificially inflated world-wide price" rather than by the domestic spillover effects. But we think that given the clear concern here with the conduct that creates the world-wide shortage or price inflation that in turn creates domestic spillover effects, it would be counter-intuitive and arbitrary to read Congress to intend to limit jurisdiction to only the subset of claims brought by plaintiffs injured by the spillover effects of the conduct at issue. Since the same conduct injures both foreign plaintiffs and domestic plaintiffs, and it is clearly the conduct that Congress aims to reach with our antitrust laws, it is reasonable to read Congress as envisioning suits by any plaintiffs who would enable our antitrust laws to reach and deter that conduct.
 
 
 66
 The House Report makes this point explicit:
 
 
 67
 The intent of the Sherman and FTC Act amendments in H.R. 5235 is to exempt from the antitrust laws conduct that does not have the requisite domestic effects. This test, however, does not exclude all persons injured abroad from recovering under the antitrust laws of the United States. A course of conduct in the United States — e.g., price fixing not limited to the export market — would affect all purchasers of the target products or services, whether the purchaser is foreign or domestic. The conduct has requisite effects within the United States, even if some purchasers take title abroad or suffer economic injury abroad. Cf., e.g., Pfizer Inc., et al. v. Government of India, et al., 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978). Foreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace, just as our citizens do.
 
 
 68
 Id. at 10. Explicitly envisioning recovery for plaintiffs who "suffer economic injury abroad," this passage seems to support appellants' less restrictive reading of the statute. But appellees point out that this passage, which seems to allow recovery by foreign plaintiffs injured abroad as long as the conduct has the "requisite domestic effects," also expressly states that "[f]oreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace" (emphasis added). This sentence suggests that foreign plaintiffs can sue under the antitrust laws for injury suffered in the domestic market. Arguably, this statement lends some support to appellees' restrictive view of the statute, but not much.
 
 
 69
 In sum, there is much in the legislative history that supports the less restrictive view of FTAIA's jurisdictional reach. There are isolated statements that are consistent with the restrictive view, but they are never offered to denigrate or exclude the less restrictive view of the statute. This is telling, we think, for if Congress intended to reject the less restrictive view of FTAIA's jurisdictional reach, there was absolutely no reason to discuss this possible basis for subject matter jurisdiction along with the restrictive view. We therefore conclude that the less restrictive view of jurisdiction is consistent with a literal interpretation of § 6a(2), and this interpretation is perfectly consistent with the legislative history.
 
 5. Deterrence
 
 70
 The Supreme Court's decision in Pfizer, Inc. v. Government of India, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978), which was issued before Congress enacted FTAIA, is cited approvingly in the legislative history to FTAIA. See H.R.REP. No. 97-686, at 10. Pfizer therefore may offer some clues as to Congress' intent in enacting FTAIA.
 
 
 71
 In Pfizer, the Supreme Court articulated policy reasons for holding that a foreign plaintiff was entitled to sue for treble damages under the antitrust laws to the same extent as any other plaintiff. Noting that one purpose of § 4 of the Clayton Act is "to deter violators and deprive them of `the fruits of their illegality,'" the Supreme Court reasoned that denying a foreign plaintiff injured by an antitrust violation the right to sue "would permit a price fixer or a monopolist to escape full liability for his illegal actions" and "would lessen the deterrent effect" of the antitrust laws. See Pfizer, 434 U.S. at 314-15, 98 S.Ct. at 589 (citations omitted). Moreover,
 
 
 72
 [i]f foreign plaintiffs were not permitted to seek a remedy for their antitrust injuries, persons doing business both in this country and abroad might be tempted to enter into anticompetitive conspiracies affecting American consumers in the expectation that the illegal profits they could safely extort abroad would offset any liability to plaintiffs at home. If, on the other hand, potential antitrust violators must take into account the full costs of their conduct, American consumers are benefitted by the maximum deterrent effect of treble damages upon all potential violators.
 
 
 73
 Id. at 315, 98 S.Ct. at 589.
 
 
 74
 On this deterrence logic, the Second Circuit in Kruman refuted the view that suits by domestic plaintiffs injured by a global conspiracy's domestic effects could adequately enforce our antitrust laws. The Second Circuit noted that, when a foreign anticompetitive scheme enhances the success of a domestic scheme, the perpetrator would have a greater incentive to pursue the global scheme, which would ultimately harm U.S. consumers if a plaintiff harmed only by the foreign effect of a global scheme had no U.S. remedy. See Kruman, 284 F.3d at 403 (citing Pfizer, 434 U.S. at 313-15, 98 S.Ct. at 587-89). Judge Patrick Higginbotham's dissent in Den Norske similarly emphasized that allowing foreign plaintiffs to sue would protect U.S. consumers by deterring perpetrators from engaging in global conspiracies that harm U.S. markets. See Den Norske, 241 F.3d at 435 (Higginbotham, J., dissenting). Judge Higginbotham, following Pfizer, reasoned that a global price-fixing scheme could sustain monopoly prices in the United States even in the face of domestic liability, since the profits from abroad would subsidize the U.S. operations. "Unless persons injured by the conspiracy's effects on foreign commerce could also bring antitrust suits against the conspiracy, the conspiracy could remain profitable and undeterred." Id.
 
 
 75
 We find this deterrence reasoning, drawn from Pfizer, and amplified in Judge Higginbotham's opinion in Den Norske, most compelling. The less restrictive interpretation of the "gives rise to a claim" language of FTAIA, allowing suits by foreign plaintiffs injured by the foreign effects of a global conspiracy, serves "the United States' narrow interest in vigorous domestic competition" better than the restrictive interpretation disallowing such suits. Id. at 438-39. Pfizer's concern was that denying a foreign plaintiff injured by an antitrust violation a remedy under our antitrust laws would permit a price fixer to escape full liability for his conduct, which would lessen the deterrent effect of the antitrust laws. This concern applies squarely to this case. Disallowing suits by foreign purchasers injured by a global conspiracy because they themselves were not injured by the conspiracy's U.S. effects runs the risk of inadequately deterring global conspiracies that harm U.S. commerce. Suits only by those injured by the U.S. effects of a conspiracy may not provide sufficient deterrence; a conspirator could expect that illegal profits abroad would offset his liability in the U.S., leaving the conspirator with an incentive to engage in global conspiracy. Allowing suits by those injured solely in foreign commerce, where the anticompetitive conduct also harmed U.S. commerce, forces the conspirator to internalize the full costs of his anticompetitive conduct.
 
 
 76
 Even assuming, arguendo, that the antitrust laws are only intended to protect selfish national interests, suits by foreign purchasers harmed solely by a conspiracy's foreign effects are necessary to protect U.S. commerce from global conspiracies. This reasoning is also supported by FTAIA's legislative history, which notes: "As the Supreme Court pointed out in Pfizer, ... to deny foreigners a recovery could under some circumstances so limit the deterrent effect of United States antitrust law that defendants would continue to violate our laws, willingly risking the smaller amount of damages payable only to injured domestic persons." H.R.REP. No. 97-686, at 10.
 
 
 77
 We are persuaded that, if foreign plaintiffs could not enforce the antitrust laws with respect to the foreign effects of anticompetitive behavior, global conspiracy would be under-deterred, since the perpetrator might well retain the benefits that the conspiracy accrued abroad. There would be an incentive to engage in global conspiracies, because, even if the conspirator has to disgorge his U.S. profits in suits by domestic plaintiffs, he would very possibly retain his foreign profits, which may make up for his U.S. liability. In any case, the profitability of the global conspiracy would depend on the uncertainties of foreign antitrust enforcement. The U.S. consumer would only gain, and would not lose, by enlisting enforcement by those harmed by the foreign effects of a global conspiracy. We think that Pfizer supports this view and that the citation to Pfizer in the legislative history of FTAIA suggests that Congress meant to endorse it as well.
 
 
 78
 6. Conclusion on Subject Matter Jurisdiction
 
 
 79
 On the basis of the foregoing, we conclude that the less restrictive view of FTAIA's jurisdictional reach, allowing subject matter jurisdiction in this case, is what Congress meant to achieve. The District Court erred in dismissing the foreign plaintiffs' federal antitrust claims for lack of subject matter jurisdiction, since under the less restrictive interpretation, the foreign plaintiffs can establish that the global conspiracy's "direct, substantial, and reasonably foreseeable effect" on domestic commerce "gives rise to a claim" under the antitrust laws.
 
 B. Standing
 
 80
 Appellees contend that, even if subject matter jurisdiction is proper, the case should nonetheless be dismissed because the foreign purchasers lack standing. Because the District Court concluded that it lacked subject matter jurisdiction over the foreign plaintiffs' claims, it declined to address the standing issue. Although the District Court did not rule on the issue, it was fully presented below, as well as before this court. Appellants ask this court to remand the case so that the District Court may examine the issue in the first instance, or alternatively, to find that they have standing.
 
 
 81
 While the District Court's failure to rule on the issue of standing "might be thought to warrant a remand, so that the district court [may] consider the matter in the first instance, the Supreme Court has instructed the courts of appeals to decide for themselves whether the party seeking judicial review has standing, even if the issue was not decided below...." Found. on Econ. Trends v. Lyng, 943 F.2d 79, 82 (D.C.Cir.1991) (citing FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)). We are thus "required to address the issue [of standing] even if the courts below have not passed on it...." FW/PBS, 493 U.S. at 230, 110 S.Ct. at 607 (citing Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848-49, 23 L.Ed.2d 404 (1969)). "[E]very federal appellate court has a special obligation to `satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review'...." FW/PBS, 493 U.S. at 231, 110 S.Ct. at 607 (citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) (citing Mitchell v. Maurer, 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934))).
 
 
 82
 To meet the constitutional requirements of standing under the Clayton Act, an antitrust plaintiff must establish "injury-in-fact or threatened injury-in-fact caused by the defendant's alleged wrongdoing." Andrx Pharms., Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 806 (D.C.Cir. 2001) (citing Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983)). The foreign purchasers have constitutional standing. They allege that they suffered injury-in-fact when they paid inflated prices for vitamins directly to the defendants. This injury was allegedly caused by defendants' conspiracy to fix vitamin prices around the world. There is no dispute that the foreign plaintiffs in this case have been injured by paying inflated prices for vitamins.
 
 
 83
 In addition, an antitrust plaintiff must establish "antitrust injury," that is, "`injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697-98, 50 L.Ed.2d 701 (1977)). Appellees argue that the plaintiffs' injuries "are not `injury of the type the antitrust laws were intended to prevent,' because those laws do not forbid the fixing of prices in the markets in which Plaintiffs purchased vitamins, but only in U.S. commerce." Appellees' Br. 42 (citation omitted). We disagree.
 
 
 84
 In this case, plaintiffs allege that the defendants engaged in a global conspiracy that had an effect on U.S. and foreign commerce. The antitrust laws do not merely forbid price-fixing in U.S. commerce, but rather forbid price-fixing that harms U.S. commerce. See, e.g., Laker Airways, 731 F.2d at 922 ("It has long been settled law that a country can regulate conduct occurring outside its territory which causes harmful results within its territory."); Alcoa, 148 F.2d at 443-44; cf. Pfizer, 434 U.S. at 314, 98 S.Ct. at 588 ("The fact that Congress' foremost concern in passing the antitrust laws was the protection of Americans does not mean that it intended to deny foreigners a remedy when they are injured by antitrust violations."). Thus, the antitrust laws forbid the fixing of prices in foreign markets where that conduct harms U.S. commerce. Where defendants' global conspiracy harms U.S. commerce, the mere fact that the foreign purchasers bought vitamins solely in foreign markets does not mean that the foreign purchasers lack standing to sue.
 
 
 85
 In Brunswick, the Supreme Court explained that, to establish "antitrust injury," the injury should be "`the type of loss that the claimed violations'" of the Sherman Act "`would be likely to cause.'" Brunswick, 429 U.S. at 489, 97 S.Ct. at 697 (quoting Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577-78, 23 L.Ed.2d 129 (1969)). The foreign purchasers of vitamins here were injured by conduct that violated the Sherman Act — a global price-fixing conspiracy. The foreign plaintiffs' paying of inflated prices in foreign commerce was loss of the type that violation of the Sherman Act would be likely to cause. Moreover, the arguments that have already persuaded us that, where anticompetitive conduct harms domestic commerce, FTAIA allows foreign plaintiffs injured by anticompetitive conduct to sue to enforce the antitrust laws similarly persuade us that the antitrust laws intended to prevent the harm that the foreign plaintiffs suffered here. The foreign purchasers' injury therefore must be deemed to be "of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendant's conduct unlawful." Brunswick, 429 U.S. at 489, 97 S.Ct. at 697. Appellants can therefore establish "antitrust injury."
 
 
 86
 In addition, we must consider the following additional Associated General Contractors factors to determine whether appellants are "proper plaintiffs": "the directness of the injury, whether the claim for damages is `speculative,' the existence of more direct victims, the potential for duplicative recovery and the complexity of apportioning damages." Andrx Pharms., 256 F.3d at 806 (citing Associated Gen. Contractors, 459 U.S. at 542-45, 103 S.Ct. at 910-12). The foreign plaintiffs allegedly purchased vitamins at inflated prices directly from the defendants, and their injury arose from defendants' alleged conspiracy to inflate prices. The injury is direct and the claim for damages is not speculative. Allowing the foreign plaintiffs to sue does not risk duplicative recovery or complex damage apportionment.
 
 
 87
 Appellees finally argue that "there is a large body of `more appropriate plaintiffs,'" namely the "[h]undreds of U.S. plaintiffs, as well as a class of domestic purchasers," who have sued the defendants. Appellees' Br. 44. But these domestic plaintiffs have not been harmed more directly by the foreign effects of the conspiracy than the foreign purchasers, and appellees do not suggest that the domestic plaintiffs can seek to recover for the same injury that the foreign plaintiffs suffered. The domestic plaintiffs are not more direct victims of defendants' conduct than the foreign plaintiffs, since the foreign plaintiffs have been injured just as directly as the domestic plaintiffs as a result of the defendants' conduct. Furthermore, for the reasons already explained, the foreign plaintiffs play an important role in the deterrence of the global conspiracy, a role that cannot be filled adequately by the domestic plaintiffs alone. Therefore, the foreign plaintiffs are proper plaintiffs to bring suit in this case.
 
 
 88
 We conclude that the foreign plaintiffs in this case have standing to bring their federal antitrust claims.
 
 C. Supplemental Jurisdiction
 
 89
 Appellants contend that, after the District Court dismissed the foreign plaintiffs' federal antitrust claims for lack of subject matter jurisdiction, it erred in declining to exercise supplemental jurisdiction over the foreign plaintiffs' foreign law claims pursuant to 28 U.S.C. § 1367. Appellants argue that "the district court has original subject matter jurisdiction over the claims of the domestic plaintiffs under the Sherman Act, and consequently, should have exercised supplemental jurisdiction over the claims of the foreign plaintiffs." Appellants' Br. 27-28.
 
 
 90
 This court reviews the District Court's decision not to exercise supplemental jurisdiction for abuse of discretion. See Diven v. Amalgamated Transit Union Int'l & Local 689, 38 F.3d 598, 601 (D.C.Cir.1994). 28 U.S.C. § 1367 provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367. Under 28 U.S.C. § 1367, "the District Court has supplemental jurisdiction over related claims when it has original jurisdiction over the initial claim." Harris v. Sec'y, U.S. Dep't of Veterans Affairs, 126 F.3d 339, 346 (D.C.Cir. 1997). "When the District Court has dismissed claims properly before it, it retains discretion to decide whether or not to dismiss other claims as to which it may exercise supplemental jurisdiction." Id. The District Court "may decline to exercise supplemental jurisdiction over a claim" if, for example, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). But "[i]f the district court dismissed the underlying claim on jurisdictional grounds, then it could not exercise supplemental jurisdiction." Saksenasingh v. Sec'y of Educ., 126 F.3d 347, 351 (D.C.Cir.1997).
 
 
 91
 When the District Court dismissed the foreign plaintiffs' underlying federal antitrust claim on jurisdictional grounds, it had no discretion to exercise supplemental jurisdiction at all over the foreign plaintiffs' foreign law claims. Appellants' assumption that the District Court's remaining jurisdiction over the domestic plaintiffs' claims can serve as the basis of supplemental jurisdiction over the foreign plaintiffs' foreign law claims is implausible, and appellants cite no cases to support this assumption. When the District Court dismissed the foreign plaintiffs' claims on jurisdictional grounds, the remaining original jurisdiction over the domestic plaintiffs' claims was irrelevant to the exercise of supplemental jurisdiction over the foreign plaintiffs' foreign law claims. The dismissal of the foreign plaintiffs' federal antitrust claims on jurisdictional grounds precluded the District Court from exercising supplemental jurisdiction over any of the foreign plaintiffs' additional claims over which the court did not have original jurisdiction.
 
 
 92
 We recognize that the District Court has already articulated reasons that counsel against exercising supplemental jurisdiction, such as comity, efficiency, and the novelty and complexity of the issues of foreign law involved. The posture of the case has now changed, however, because we reverse the District Court's decision on subject matter jurisdiction and vacate its judgment against appellants. On remand, the District Court will have original jurisdiction over the foreign plaintiffs' federal antitrust claims. Therefore, the District Court must consider anew whether to exercise its discretion to accept supplemental jurisdiction over the foreign plaintiffs' foreign law claims. But the District Court still retains discretion to decline to exercise supplemental jurisdiction over the foreign law claims pursuant to 28 U.S.C. § 1367.
 
 III. CONCLUSION
 
 93
 For the reasons stated above, we reverse the District Court's decision, vacate the judgment against appellants, and remand the case for further proceedings consistent with this opinion.
 
 
 94
 KAREN LeCRAFT HENDERSON, Circuit Judge, dissenting:
 
 
 95
 I disagree with the majority's interpretation of the Foreign Trade Antitrust Improvements Act (FTAIA), 15 U.S.C. § 6a, and, consequently, with its disposition of this appeal.[1] The majority decides whether a court has jurisdiction over claims asserted by a plaintiff in one action by reference to a hypothetical claim another party could, perhaps, raise in some other proceeding. This seems a peculiar notion. The more natural reading of the statutory language, I believe, is the narrower one adopted by the district court below and by the Fifth Circuit in Den Norske Stats Oljeselskap As v. HeereMac Vof, 241 F.3d 420 (5th Cir.2001), under which the phrase "gives rise to a claim" refers to the claim advanced by the plaintiff in the action before the court. This reading, to me, reflects the Congress's "unambiguously expressed intent" under Chevron USA Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). It is also consistent with the legislative history that the majority cites.
 
 
 96
 The Fifth Circuit's narrower construction is unambiguously supported by the House Report's declaration that "the `effect' providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws." H.R. Rep. No. 97-686, at 11-12 (emphasis added); see maj. op. at 345. The plain meaning of this statement is not undercut, as the majority contends, by the two sentences that follow; they simply explain that, so long as "the basis of the claim has had the requisite impact on the domestic or import commerce of the United States,"[2] the claim does not fail simply because "the impact of the illegal conduct" is not "experienced by the injured party within the United States." H.R. Rep. No. 97-686, at 12; see maj. op. at 352-53. Another excerpt the majority quotes similarly explains that "[f]oreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace, just as our citizens do" so long as "the conduct has the requisite effects within the United States, even if some purchasers take title abroad or suffer economic injury abroad." See H.R. Rep. No. 97-686, at 10 (quoted in maj. op. at 354) (emphasis added). Taken together, these two excerpts make clear that neither the situs of the injury nor the nationality of the claimant is jurisdictionally dispositive so long as there is a sufficient domestic impact or effect to satisfy subsection (1) of the FTAIA. Neither excerpt purports to eliminate the requirement in subsection (2) that such domestic impact give rise to the claimed injury wherever and by whomever felt. Other of the majority's citations likewise relate to the first prong of the jurisdictional test, in subsection (1), and so are of no assistance in construing the second prong of the test set out in subsection (2). See maj. op. at 352-54 (quoting H.R.Rep. No. 97-686, at 9-10, 11, 13). Finally, the Report expressly relies, as the majority observes, on the United States Supreme Court's decision in Pfizer v. Government of India, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978), but only for the broad proposition that "[t]o deny foreigners a recovery could under some circumstances so limit the deterrent effect of United States antitrust law that defendants would continue to violate our laws, willingly risking the smaller amount of damages payable only to injured domestic persons." H.R. Rep. No. 97-686, at 10 (quoted in maj. op. at 356) (emphasis added). The Report does not suggest the deterrence policy discussed in Pfizer justifies expanding jurisdiction beyond the limits expressed in subsection (2) of the FTAIA.
 
 
 97
 Finally, I believe that our decision in Caribbean Broadcasting Sys., Ltd. v. Cable & Wireless PLC, 148 F.3d 1080 (D.C.Cir.1998), cannot be construed to support the majority's interpretation of the FTAIA. As a textual matter, the court in Caribbean addressed only subsection (1) of the FTAIA, with nary a mention of subsection (2). Even were we to presume that the court sub silentio considered the second prong of the jurisdictional test, the plaintiffs' allegations plainly show that, notwithstanding the majority's contrary assertion, see maj. op. at 346, the alleged domestic effect did in fact give rise to the foreign plaintiff's anti-trust claim. In Caribbean Broadcasting the court found the foreign plaintiff had adequately alleged that (1) the defendants engaged in "anticompetitive conduct" — "namely, that the defendants made fraudulent misrepresentations to advertisers and sham objections to a government licensing agency in order to protect their monopoly" over FM radio advertising in "the market for English-language radio broadcast advertising in the Eastern Caribbean"; (2) "U.S. customers in the relevant market suffered antitrust injury, to wit, they paid excessive prices for advertising because of the unlawful actions of [the defendants]"; and (3) the foreign plaintiff "was and remains foreclosed from selling advertising to many of those U.S. companies that had purchased advertising time from [the defendant radio broadcaster]." 148 F.3d at 1087. Thus it is clear that the defendants' fraudulent anticompetitive conduct had the effect of causing U.S. companies to advertise only with the defendants and that this effect gave rise to the foreign plaintiff's claim for lost customers.
 
 
 98
 In sum, because I believe that the plain language in subsection (2) of the FTAIA expressly limits jurisdiction to a claim which itself arises from the domestic antitrust effect required under subsection (1) of the statute, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 I nonetheless agree with the majority's determination that the district court lacked discretion to exercise supplemental jurisdiction once it had dismissed all of the appellants' claims under United States lawSee maj. op. at 359.
 
 
 [2]
 Notably, the word "claim" in the quoted language refers to the specific claim asserted by the injured party