DIANE P. WOOD, Circuit Judge,
dissenting, with whom Circuit Judges EASTERBROOK, MANTON, and ILANA DIAMOND ROVNER join.
In straightforward language, the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), 15 U.S.C. § 6a, says that the Sherman Act “shall not apply” to conduct involving foreign trade or commerce unless that conduct has a “direct, substantial and reasonably foreseeable effect” on either U.S. domestic commerce, U.S. import commerce, or (for U.S. exporters only) on U.S. export commerce. The question before us today, which not only reaches this court as an issue of first impression, but which has also never been analyzed thoroughly by any other court, is whether these criteria for the statute’s “applicability” strip federal district courts of their acknowledged subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over cases that do not meet the test, or if instead they describe an element of the plaintiffs claim. The majority has opted for the former approach, largely because the word “jurisdiction” appears in many prior decisions of lower courts and in certain materials published by the government’s antitrust enforcement agencies and the American Bar Association. But neither the majority nor those earlier opinions have distinguished carefully between judicial and legislative jurisdiction — or, to put it differently, between jurisdiction to decide a case and jurisdiction to prescribe a rule of law. The central question now before us is whether the FTAIA affects the former or the latter power. Given the fact that “jurisdiction is a word of many, too many, meanings,” ante at 947-48, quoting United States v. Vanness, 85 F.3d 661, 663 n. 2 (D.C.Cir.1996), which was quoted in Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 90, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), it is plain that the analysis cannot stop with the observation that the FTAIA somehow affects “jurisdiction.”
In my view, there are at least four compelling reasons why we should not construe the FTAIA’s test as one going to the *954 subject matter jurisdiction of the court, and instead should adopt what I will call an “element” approach: first, the language of the statute supports the position that this is an element of the claim, especially when it is contrasted to true jurisdiction-stripping statutes; second, the “subject matter jurisdiction” characterization is inconsistent with the Supreme Court’s decision in Steel Co. and with the law of this court; third, the procedural consequences of a “subject matter jurisdiction” reading would have perverse effects, measured against the policies the FTAIA and the federal antitrust laws were designed to further; and finally, to call this “subject matter jurisdiction” fails to take into account the long history of the application of the U.S. antitrust laws to foreign conduct.
I
Although the majority has set forth the relevant language of the FTAIA, it bears repeating here, both for ease of reference and for emphasis. It reads as follows (and there is equivalent language covering section 5 of the Federal Trade Commission Act):
Sections 1 to 7 of this title [Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
(1) such conduct has a direct, substantial and reasonably foreseeable effect—
A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
B) on export trade or export commerce with foreign nations, of a person engaged in such trade or in commerce in the United States; and
(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.
15 U.S.C. § 6a.
One will search in vain in this brief passage for any hint that the Congress was attempting to strip federal courts of their competence to hear and decide antitrust cases with a foreign element. In my view, that alone should be enough to tip the balance toward the “element” characterization. To begin with, while one can find examples in Supreme Court decisions of the Court’s treatment of statutes with jurisdictional language as non-jurisdictional (e.g., Steel Co., discussed below; Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 950-51, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (False Claims Act)), there are no examples of the opposite approach — •treating something as jurisdictional that is phrased in terms of the scope of application of a statute. Secondly, this court has recognized that jurisdiction-stripping rules must be expressed clearly. In Czerkies v. U.S. Department of Labor, 73 F.3d 1435 (7th Cir.1996) (en banc), we held that the door-closing statute prohibiting judicial review of certain federal workers’ compensation claims should not be construed to bar review of constitutional claims in the absence of express language to that effect. Id. at 1439. The same approach is appropriate for other kinds of jurisdiction-stripping statutes. Naturally, when Congress does speak clearly, as it did in the statute that bars judicial review of certain immigration decisions, see 8 U.S.C. §§ 1252(a)(2)(B) and 1255, the courts do and should recognize that their competence to act has been withdrawn. See McBrearty v. Perryman, 212 F.3d 985 (7th Cir.2000) (dismissing suit attempting to avoid § 1252(a)(2)(B), which provides that “notwithstanding any other provision of law, no court shall have juris *955 diction to review ... any judgment regarding the granting of relief under” section 1255). Language like that of the FTAIA, stating that a law does not “apply” in certain circumstances, cannot be equated to language stating that the courts do not have fundamental competence to consider defined categories of cases.
II
The fact that the FTAIA does not contain a clear congressional statement that it is intended to restrict the subject matter jurisdiction of the federal courts (or for that matter even a brief mention of the term “jurisdiction”) should be enough to resolve the question before us. If more is needed, then we must consider further how to determine whether a particular law affects the competence of a federal court to entertain the case at all, or if it simply outlines the scope of the statute and permits the court to issue a decision on the merits either upholding or rejecting a claim. Our starting point should be the Supreme Court’s decision in Steel Co., supra, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210. In Steel Co., the Supreme Court held that the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA), 42 U.S.C. § 11046(a)(1), which permitted a private action only if certain prerequisites were satisfied, did not affect the district court’s subject matter jurisdiction. 523 U.S. at 89-90, 118 S.Ct. 1003. Although the EPCRA actually used the word “jurisdiction” to describe the permitted actions, the Court did not find that fact dispositive. Instead, it reaffirmed the long-standing rule that power to adjudicate a case does not depend on whether in the final analysis the plaintiff has a valid claim. “[T]he district court has jurisdiction if the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another.” Id. at 89, 118 S.Ct. 1003 (internal quotations omitted). In the present case, the plaintiffs will have a right to recover if defendants’ activities have the requisite effect on either U.S. domestic or import commerce (and they can prove the remainder of their federal antitrust claim), and they will lose if those effects are lacking.
It is worth noting that the extraterritorial reach of statutes varies widely. Some statutes, such as Title VII of the Civil Rights Act of 1964, have been interpreted by the Supreme Court as having no application at all beyond U.S. borders, even if both the employer and the employee are U.S. citizens. See EEOC v. Arabian American Oil Co., 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). Other statutes, such as 18 U.S.C. § 2333, are virtually unlimited in their territorial reach. Section 2333 provides a private right of action for civil damages for any national of the United States injured “by reason of an act of international terrorism” (or the victim’s estate) to sue those responsible for the act in a U.S. court for treble damages, no matter where in the world the act occurred, and no matter what the nationality of the perpetrator was. See Boim v. Quranic Literacy Inst., 291 F.3d 1000 (7th Cir.2002). Still other statutes are like the FTAIA: they define a subset of actions and actors outside the United States whose actions fall within the scope of U.S. law. It is up to Congress to decide how broad or narrow a law it is enacting, and what the plaintiff must prove to be entitled to relief.
That is what Congress did in the FTAIA: it established the “direct, substantial, and reasonably foreseeable” effect on commerce test as an element of the plaintiffs claim. It did not disempower *956 the federal courts from ruling on the merits for a defendant when the plaintiff is unable to make the requisite showing. The majority’s suggestion that the Supreme Court held otherwise in Hartford Fire Ins. v. California, 509 U.S. 764, 812, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) is inaccurate. In fact, the Hartford Fire majority thought it unnecessary to address the FTAIA’s effect on the case at all, see id. at 797 n. 23, 113 S.Ct. 2891, and thus it had no need to engage the dissenters on the “element” versus “jurisdiction” point. It is true that Justice Scalia, writing for the four dissenters, observed that “[a] cause of action under our law was asserted here, and the court had power to determine whether it was or was not well founded in law and in fact.” Id. at 812, 113 S.Ct. 2891. Even though this isolated statement was in a dissent and thus not authoritative at the time it was made, the more important point is that the legal principle it reflected was later adopted by a majority of the Court first in Steel Co., and then later in United States v. Cotton, 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (“[Ex parte] Bain’s [121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887)] elastic concept of jurisdiction is not what the term “jurisdiction” means today, ie., “the courts’ statutory or constitutional power to adjudicate the case.” ”) (Emphasis in original, quoting from Steel Co.). The approach I am advocating is entirely consistent, therefore, with current Supreme Court doctrine.
This court has had occasion to consider the question whether effect-on-commerce elements analogous to those in the FTAIA affect subject matter jurisdiction or the statement of a claim, and we have concluded that they do not. See United States v. Martin, 147 F.3d 529 (7th Cir.1998), cited with approval in United States v. Rayborn, 312 F.3d 229, 231 (6th Cir.2002); United States v. Carr, 271 F.3d 172, 178 (4th Cir.2001); United States v. Prentiss, 256 F.3d 971, 982 (10th Cir.2001); United States v. Beck, 250 F.3d 1163, 1165 (8th Cir.2001); Alikhani v. United States, 200 F.3d 732, 734-35 (11th Cir.2000). While the statute at issue in Martin was a criminal law, 18 U.S.C. § 844(i), I agree with the First Circuit that there is no jurisdictional distinction in the Sherman Act between the civil and criminal reach of the statute. See United States v. Nippon Paper Indus., 109 F.3d 1 (1st Cir.1997). (Indeed, I do not understand the majority to be taking issue with this aspect of the Nippon Paper holding.) The fact that the present case is civil, and Martin was criminal, therefore provides no reason not to follow Martin’s jurisdictional characterization. Nor do I see any other principled distinction that can be drawn between our analysis in Martin and the problem now before us.
Ill
Yet another reason why the majority’s rule is ill-advised comes from the nature of jurisdictional rules and the consequences of treating something as affecting the subject matter jurisdiction of the court. Rules about subject matter jurisdiction define the allocation of business between the federal and the state courts. The federal courts are courts of limited jurisdiction. Only if Article III of the Constitution confers power on them to hear the particular kind of case or controversy at issue, and if a statute of Congress has implemented that constitutional grant of power, can a case be heard in federal court.
The first point here is that a recognized issue of subject matter jurisdiction must be resolved before any other action is taken on the case. There is an important institutional interest in resolving jurisdictional questions quickly and simply. Congress recognized this in one of its classic *957 jurisdiction-stripping rules: federal appellate courts have no jurisdiction to review district court decisions remanding cases to state court when the district court relies on a reason outlined in 28 U.S.C. § 1447(c). See 28 U.S.C. § 1447(d). Inquiries into whether a case “arises under” federal law, for purposes of § 1331 jurisdiction, can normally be completed by a review of the complaint. Inquiries into diversity jurisdiction are often just as straightforward, even though fact-finding might be necessary in the occasional case in which it is unclear where a person is domiciled, or what amount is in controversy, or which of several corporate facilities should count as the corporation’s principal place of business.
The jurisdictional inquiries just described are well-defined and do not normally consume enormous judicial resources. In contrast, an inquiry into whether a particular course of conduct has a “direct, substantial, and reasonably foreseeable effect” on either the domestic commerce of the United States or its import commerce threatens to become a preliminary trial on the merits. Indeed, the record in one famous international antitrust case, Timberlane Lumber Co. v. Bank of America, N.T. & S.A., should give advocates of the “subject matter jurisdiction” approach serious pause. That case was originally filed in the district court in 1973. In 1974, the district court dismissed for want of “subject matter jurisdiction.” The Ninth Circuit reversed in 1976. See 549 F.2d 597 (9th Cir.1976). Six years of discovery then took place, in which the parties explored the effects of the alleged conspiracy on U.S. commerce. In 1983, the district court again dismissed the action for want of jurisdiction. See 574 F.Supp. 1453 (N.D.Cal.1983). Up on appeal again to the Ninth Circuit, the case was affirmed, though on somewhat different grounds. 749 F.2d 1378 (9th Cir.1984). In 1985, the Supreme Court denied certiorari, see 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985), with a note indicating that Justices White and Blackmun would have granted review. Thus, at least 12 years after the case was filed, the “jurisdictional” issue was finally resolved. Had it been resolved in the affirmative, there is no telling how many more years would have passed before the litigation was over. This is no way to decide whether the federal courts are competent to hear a case.
The element approach, in contrast, has none of those defects. In some instances, it will be possible to resolve the FTAIA issue on the pleadings or on summary judgment, and appellate review from either kind of decision de novo. If the issue is not capable of resolution on summary judgment, that should be a red flag in any event. Effect on commerce issues will often be closely intertwined with the merits. Yet if the case reaches the merits, there is no reason why the court cannot resolve the most straightforward issue first. Many antitrust cases founder on the issue of market power, especially when world markets are at issue. But Steel Co. made it abundantly clear that courts are not entitled simply to assume jurisdiction and resolve an easy merits issue, if true subject matter jurisdiction is at stake.
If something affects the subject matter jurisdiction of the court, there are a number of other consequences which would be undesirable for the FTAIA. First, there is necessarily never a time when the question cannot be raised. As the Supreme Court has repeatedly emphasized, the fundamental competence of the court to act can be challenged at any time, up to and including at the Supreme Court level. See, e.g., Mansfield, C. & L.M. Ry. Co. v. Swan, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884); 20 Charles Alan Wright & Mary Kay Kane, Federal Courts § 7 at 28 *958 (5th ed.1994). This would offer an irresistible invitation to the losing party in an international antitrust case to invite the Supreme Court to revisit the complex question whether there are direct, substantial, and reasonably foreseeable effects on U.S. commerce, whether or not that objection was preserved before the district court or the court of appeals. Indeed, the court will be required to raise the issue on its own, even if the parties have been content to stipulate to dollar amounts of commerce, destinations of goods, business plans tending to show foreseeability, and other pertinent facts. In many cases, the parties may be willing to stipulate that the necessary effects on U.S. commerce are present, so that they can get down to the business of resolving their dispute. All that is impossible if we are dealing with subject matter jurisdiction.
Second, characterization affects removal. Recall that the subject matter rules indicate whether the case falls within the limited jurisdiction of the federal courts. If it does not, then it presumptively can be heard by a state court of general jurisdiction. Although the federal antitrust laws are commonly held to fall within the exclusive jurisdiction of the federal courts, nothing requires Congress to keep things that way. If Congress indeed meant to strip the federal courts of subject matter jurisdiction over foreign commerce antitrust cases, then those cases revert to state courts. No one has suggested that we can also divine from the language' of the FTAIA a congressional intent to deny any U.S. forum whatsoever for foreign commerce cases. (Indeed, serious constitutional questions would arise if we were to read the statute as purporting to define the jurisdiction of the state courts, given the degree of sovereignty the states retain under the federal Constitution.) Thus, state courts can and will hear foreign commerce antitrust cases where “direct, substantial, and reasonably foreseeable” effects are missing. Some of those state courts might dismiss on forum non conve-niens grounds; some might apply their own test for whether a claim is stated and dismiss on the merits; some might keep the case and adjudicate it, creating far greater friction with foreign sovereigns than would result from exclusive federal jurisdiction and an elements-based test. Naturally, if this kind of case is filed in state court, it cannot be removed to federal court, because suits may be removed only if they could have been filed originally in a federal court. See 28 U.S.C. § 1441; Syngenta Crop Protection, Inc. v. Henson, - U.S. -, 123 S.Ct. 366, 369-70, 154 L.Ed.2d 368 (2002). Furthermore, even if such a case is physically removed and is lodged in the federal court on an untenable claim of federal jurisdiction, the federal court (after potentially lengthy inquiries into the FTAIA test) will be required to remand it for lack of jurisdiction. See 28 U.S.C. § 1447(c). Such a decision is not a decision on the merits, and it will thus not block further proceedings in the state court.
There are also consequences for appellate review if this is a jurisdictional issue. As already noted, district courts resolve whatever jurisdictional facts are contested in advance of the trial. Appellate review of those fact-findings is deferential. Although the defendants argued that the policies behind the FTAIA — particularly the avoidance of diplomatic tensions with other countries — are better served by the jurisdictional characterization, that assumes that district courts will systematically reject jurisdiction. There is no reason at all to make such an assumption. If district courts find the FTAIA test satisfied, foreign parties will be stuck with deferential appellate review of those facts. This also means that appellate courts will not be *959 free to give plenary consideration to the sensitive issues of international comity that can arise in these cases — issues better resolved at the level of the court of appeals or the Supreme Court than by a solitary district judge. For all these reasons as well, it is preferable to treat the FTAIA as establishing an element of the claim.
The subject matter jurisdiction characterization makes no sense, either from the point of view of the policies being furthered by the FTAIA, or from the standpoint of judicial administration. We should not adopt a perverse decision just because parties have chosen to file motions under Rule 12(b)(1) instead of Rule 12(b)(6) or Rule 56, or because courts have unquestioningly adopted the diction of “subject matter jurisdiction” without careful examination.
IV
Finally, if all the rest of these reasons were not enough to compel an “element” reading, a review of the history of the application of the antitrust laws to persons and conduct beyond the borders of the United States also leads to that result. As the majority notes, the first time the Supreme Court had occasion to consider the question whether the Sherman Act applied to activities outside the United States occurred less than 20 years after the passage of the Act, in American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909). There, wilting for the Court, Justice Holmes rejected the plaintiffs argument that the Sherman Act penalized an elaborate arrangement by the defendant that affected banana imports into the United States. At the center of the case was a dispute between Panama and Costa Rica over which country had sovereign authority over a particular banana plantation; plaintiff claimed that the defendant had instigated the border war for purposes of controlling the banana trade. Using language that proved to be far broader than later courts were willing to accept, Justice Holmes wrote that “the general and almost universal rule is that the character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done.” Id. at 356, 29 S.Ct. 511. Moreover, he wrote, “in case of doubt, [one would be led to] ... a construction of any statute as intended to be confined in its operation and effect to the territorial limits over which the lawmaker has general and legitimate power.” Id. at 357, 29 S.Ct. 511. Nothing in this language suggests that the Court thought it was addressing federal court subject matter jurisdiction in the sense of the competence of a court with limited powers to resolve the dispute. This was a topic with which the Justices were certainly familiar, having dismissed an action only one year earlier themselves for failure to satisfy the well-pleaded complaint rule, despite the fact that no one had noticed the problem before the case reached the high court. See Louisville & Nashville R.R. v. Mottley, 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908). Instead, it was talking about how broad a statute Congress had enacted, and how much conduct Congress was trying to regulate. It was the legislative branch, in short, which the Court thought had not reached out to cover an intergovernmental dispute affecting international trade in bananas. There was not a hint that the federal courts had no competence to decide that the Sherman Act did not reach that far.
Between the time American Banana was decided and the time when the Second Circuit rendered its Alcoa decision, the Court handed down at least two decisions that qualified the strict territorial view of the former case. See United States v. American Tobacco Co., 221 U.S. 106, 31 *960 S.Ct. 632, 55 L.Ed. 663 (1911); United States v. Sisal Sales Corp., 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927). Both cases also talk in terms of the coverage of the antitrust statutes with respect to the foreign activities and actors. American Tobacco upheld the application of the statute to two English corporations, see 221 U.S. at 172, 184-85, 31 S.Ct. 632, and Sisal Sales upheld the application of the laws to a Mexican-based conspiracy to control the importation of sisal from Mexico into the United States and its subsequent sale.
The next major decision addressing the extent to which the U.S. antitrust laws reach foreign parties and conduct was United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir.1945) [hereinafter Alcoa]. In that case, the court had to decide whether certain foreign parties, who had acted wholly outside the United States, had nonetheless violated the Sherman Act. As the court put it, “[d]id either [agreement] violate § 1 of the Act? ... [W]e are concerned only with whether Congress chose to attach liability to the conduct outside the United States of persons not in allegiance to it. That being so, the only question open is whether Congress intended to impose the liability .... ” 148 F.2d at 443. Turning to the field of “conflict of laws” for guidance, the court concluded that “the Act does not cover agreements, even though intended to affect imports or exports, unless its performance is shown actually to have had some effect upon them.” Id. at 444. In time, this became known as the “intended effects” test, which in various forms governed until the FTAIA was passed, and arguably still applies in import cases. See Hartford Fire, 509 U.S. at 796, 113 S.Ct. 2891 (“it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States”) and at 797 n. 23, 113 S.Ct. 2891 (indicating that it was not necessary to address the question whether the FTAIA affected the case).
The Alcoa decision was not warmly received in other countries, which as of the mid-1940s did not as a rule have antitrust laws and which resented the apparent effort of the United States to act as the world’s competition police officer.[1] See generally Spencer Weber Waller, Antitrust and American Business Abroad, vol. I, ch. 4. This led to an outpouring of scholarly writing on the general question of the way prescriptive jurisdictional lines should be drawn among nations from the perspective of public international law. The fruits of this effort appear today in the American Law Institute’s influential Restatement (Third) of the Foreign Relations Law of the United States (“Restatement Third”), Part IV (1987), which addresses the subject of jurisdiction and judgments. The Restatement Third identifies three types of jurisdictional limitations recognized by international law: those on jurisdiction to prescribe (“i.e. to make [the state’s] law applicable to the activities, relations, or status of persons, or the interests of persons in things, whether by legislation, by executive act or order, by administrative rule or regulation, or by determination of a *961 court”), those on jurisdiction to adjudicate, and those on jurisdiction to enforce. Restatement Third, § 401. Section 415 of the Restatement Third is devoted specifically to jurisdiction to regulate anti-competitive activities.
The commentary to section 401 addresses exactly the problem now before us: that is, what is the relation between the various heads of jurisdiction identified in the Restatement and the domestic U.S. concept of “subject matter jurisdiction.” Comment c reads as follows:
“Subject matter jurisdiction,” in common usage in other contexts, is not used in this Restatement. This term sometimes refers to the constitutional authority of a governmental body, for example the authority of Congress under the United States Constitution to legislate on a subject (principally under Article I, Section 8), or the authority of a State of the United States to legislate within constitutional limitations on State authority (Article I, Section 10). The term is also often used in judicial decisions to describe other limitations on governmental authority, including those involving the reach of United States law, addressed in this Restatement as jurisdiction to prescribe. Jurisdiction to prescribe with respect to transnational activity depends not on a particular link, such as minimum contacts (“use of the mails,” or “crossing state lines”), which have been used to define “subject matter jurisdiction” for constitutional purposes, but on a concept of reasonableness based on a number of factors to be considered and evaluated. §§ 402-403.
Thus, the domestic concept of subject matter jurisdiction has no bearing on the question whether the United States validly prescribed a certain rule of law. Section 415 offers detailed guidance on the scope of prescriptive jurisdiction in cases dealing with anticompetitive activities.[2]
It is this topic of prescriptive jurisdiction, and how far the U.S. antitrust laws were actually reaching, that was before Congress when it enacted the FTAIA. (While it is true that the House Report on the FTAIA uses the word “jurisdiction” with some regularity, it also speaks re *962 peatedly about whether U.S. antitrust law should be applied to particular transactions. See H.R.Rep. No. 97-686, 97th Cong., 2d Sess. (1982), U.S. Code Cong. & Admin. News at 2487. It is therefore impossible to draw any firm conclusions from that brief document that will assist us in resolving the issue presently before us.) Congress was trying simultaneously to assure U.S. companies that they would not be subject to potentially stricter U.S. antitrust laws when they were conducting business wholly in foreign markets, and to assure foreign countries and their citizens that they would not be swept into a U.S. court to answer under U.S. law for actions that were of no legitimate concern to the United States. Ronald W. Davis, International Cartel and Monopolization Cases Expose a Gap in Foreign Trade Antitrust Improvements Act, 15 Sum-Antitrust 53, 53-58 (2001). This much is fairly clear. What has not been clear has been the way in which the FTAIA itself has been handled in the federal courts.
At one level, virtually everyone concedes that federal subject matter jurisdiction exists in cases like United Phosphorus’s. The claim certainly arises under a federal law — the Sherman Act — and thus falls within the scope of 28 U.S.C. § 1331 and 28 U.S.C. § 1337. Furthermore, typically no one claims that the claim presented is so frivolous that jurisdiction fails under the principle acknowledged in Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Nevertheless, as the majority has accurately noted, defendants who believe that their activities were too “foreign” to be swept under the U.S. antitrust laws have usually attacked the plaintiffs case with a motion under FED. R. CIV. P. 12(b)(1), which covers “lack of jurisdiction over the subject matter,” and sometimes in the alternative with a motion under Rule 12(b)(6), which covers “failure to state a claim upon which relief can be granted.”
Although several courts of appeals have decided dismissal motions based on the FTAIA under the rubric of “subject matter jurisdiction,” see, e.g., Empagran S.A. v. F. Hoffman-LaRoche, Ltd., 315 F.3d 338 (D.C.Cir.2003); Kruman v. Christie’s Int’l PLC, 284 F.3d 384 (2d Cir.2002); Den Norske Stats Oljeselskap AS v. HeereMac Vof, 241 F.3d 420 (5th Cir.2001), cert. denied, 534 U.S. 1127, 122 S.Ct. 1059, 151 L.Ed.2d 967 (U.S. Feb. 19, 2002) (00-1842); Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC, 148 F.3d 1080 (D.C.Cir.1998), most have focused on the merits of the FTAIA analysis rather than the precise procedural manner in which it was presented. None of them has given the sustained attention to the “jurisdiction vs. element” inquiry that this court has now done.
Indeed, in the most recent of these decisions, Empagran, the court was singularly unconcerned with the distinction between these two approaches. It certainly speaks of a lack of “subject matter jurisdiction” under the federal antitrust laws, 315 F.3d at 340-41, and the issue reached the court on a motion made under FED. R. CIV. P. 12(b)(1), but both the test the court adopted and its analysis are telling for our purposes. The test it chose to use for FTAIA cases was as follows:
We hold that where the anticompeti-tive conduct has the requisite harm on United States commerce, FTAIA permits suits by foreign plaintiffs who are injured solely by that conduct’s effect on foreign commerce. The anticompetitive effect itself must violate the Sherman Act and the conduct’s harmful effect on United States commerce must give rise to “a claim” by someone, even if not the foreign plaintiff who is before the court.
Id. at 341. In other words, if one is to take the “subject matter jurisdiction” charac *963 terization seriously, the court is competent to decide the case only if it concludes (tentatively? conclusively?) that the statute has been violated 'and someone has standing to sue. With all due respect to my colleagues in the D.C. Circuit, I find such an approach to subject matter to be inconsistent with the Supreme Court’s decisions in cases like Steel Co. and Bell v. Hood. (For the record, I am not necessarily expressing any disagreement with the ultimate result in Empagran; my concern is only with this implicit part of the court’s rationale.)
Even more troublesome is the court’s analysis of subject matter jurisdiction. It begins with the observation that its review is de novo. 315 F.3d at 343-44. This, of course, would be true if the dismissal were under Rule 12(b)(6) or Rule 56. If it is really under Rule 12(b)(1) and the district court has made findings of fact, then it is not accurate; the legal conclusion would be reviewed de novo, but the facts would be reviewed deferentially. In any event, the court continues with the following passage:
A complaint may be dismissed for lack of subject matter jurisdiction only if “ ‘it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.’” Sinclair v. Kleindienst, 711 F.2d 291, 293 (D.C.Cir.1983) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957)). In our review, this court assumes the truth of the allegations made and construes them favorably to the pleader. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).
315 F.3d at 343. The problem with this passage is that almost all of it describes not the rule that applies to motions to dismiss for lack of subject matter jurisdiction, but instead motions to dismiss for failure to state a claim. In Sinclair, for example, the district court had dismissed the claim under Rule 12(b)(6), and the passage to which the Empagran court referred correctly quotes the governing standard from Conley. But the passage in Conley has nothing to do with subject matter jurisdiction dismissals. It says instead that “a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” 355 U.S. at 45-46, 78 S.Ct. 99. While Scheuer states that “in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a claim, the allegations of the complaint should be construed favorably to the pleader,” 416 U.S. at 236, 94 S.Ct. 1683, it made this comment in the context of its review of a dismissal based on the Eleventh Amendment, on its way to remanding the case to the lower courts for further fact-finding. It in no way purported to change the rule that when subject matter jurisdiction is contested, the district court itself must hold a hearing to resolve the jurisdictional facts, and that the ultimate decision is for the court, not for a jury. See generally 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1350 at 234-35 (2d ed.1990). Thus, to the extent that others should follow what the Empagran court did, rather than what it said in passing, one should take this as a case acknowledging that a dismissal for failure to meet the standards of the FTAIA is one for failure to state a claim.
The Second Circuit’s Kruman decision also spoke in terms of a “subject matter jurisdiction” dismissal, see 284 F.3d at 390, and it correctly noted that the district court could “resolve disputed jurisdictional issues of fact through reference to evidence outside of the pleadings.” Id. Nev *964 ertheless, as in Empagran, the court paid no attention to the issue now before us; it was concerned instead about the type of effect on domestic (or import) commerce the FTAIA requires before conduct could be “regulated by the Sherman Act.” Id. The same is true of the Fifth Circuit’s decision in Den Norske, see 241 F.3d at 424-25, and the D.C. Circuit’s earlier decision in Caribbean Broadcasting, see 148 F.3d at 1085. It is this court, sitting en banc, that will be the first one to give a fully considered answer to the question whether the FTAIA strips the federal courts of their competence to hear certain cases that lack sufficient connections to the United States, or if it affirmatively imposes on a plaintiff the burden of proving as an element of its case the existence of those connections.
y
For all these reasons, I believe that the FTAIA adds an element to an antitrust claim for cases, as the statute puts it, that present “conduct involving trade or commerce (other than import trade or import commerce) with foreign nations.” It does not strip the federal courts of subject matter jurisdiction in those cases — a conclusion that would leave the court powerless to make a ruling on the merits of the case, and that would leave the defendants open to suit either in state courts or before other tribunals, judicial or arbitral. The majority’s conclusion will also have significant effects on the government’s criminal antitrust enforcement program. The Sherman Act, of course, makes it a serious felony to enter into an agreement in restraint of trade. The current Acting Assistant Attorney General in charge of the Department of Justice’s Antitrust Division, R. Hewitt Pate, recently had the following comments about the Department’s international criminal enforcement:
Since late 1996, the Division has prosecuted international cartels affecting over $10 billion in U.S. commerce. Well over 90 percent of the total criminal fines we have obtained in this time period were from international cartel cases.... The international cartels we have uncovered involved a wide range of industries, including the food and feed additives, graphite electrode, vitamins, construction, fíne arts, and textile industries ....
Recently, we have concentrated not just on prosecuting corporate cartel members but also on punishing individuals who create and operate the cartels .... In the past fiscal year, defendants in Division cases were sentenced to more than 10,000 jail days — a record' — with an average sentence of more than 18 months.... It is not just U.S. executives who are facing prison sentences, but foreign executives as well....
Turning to our current docket, we now have almost forty grand juries investigating suspected international cartel activity, representing almost half of the Division’s criminal investigations.
R. Hewitt Pate, “The DOJ International Antitrust Program — Maintaining Momentum,” Speech Before the American Bar Association Section of Antitrust Law, 2003 Forum on International Competition Law, New York City, February 6, 2003, available at http://www.usdoj.gov/atr/public /speeches/200736.pdf (emphasis in original). The government will not want to conduct these investigations in the Seventh Circuit. Defects going to the subject matter of the court can be raised at any time, even if a defendant has pleaded guilty (and guilty pleas play the same important role in antitrust prosecutions as they do in other fields of criminal law). See, e.g., United States v. Cotton, 535 U.S. 625, 122 *965 S.Ct. 1781, 1785, 152 L.Ed.2d 860 (2002) (“Bain’s elastic concept of jurisdiction is not what the term ‘jurisdiction’ means today, i.e. ‘the courts’ statutory or constitutional poiver to adjudicate the case, [citing Steel Co.]. This latter concept of subject-matter jurisdiction, because it involves a court’s power to hear a case, can never be forfeited or waived.”); United States v. Broce, 488 U.S. 563, 569, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). Indeed, even after direct appeals are over, a defect going to the subject-matter jurisdiction of the court can be raised in a motion under 28 U.S.C. § 2255. From this time forth, therefore, any defendant who believes that the prosecutor has failed to meet the standards of the FTAIA in an antitrust prosecution will be free to raise this point either for the first time on appeal, or in a § 2255 petition. Compare United States v. Gonzalez, 311 F.3d 440, 443-44 (1st Cir.2002) (rejecting a subject-matter-jurisdictional interpretation of a statute permitting drug prosecutions on stateless vessels).
It is important to recall, finally, that there is nothing unique about international antitrust cases. If effect-on-commerce rules are truly jurisdictional, then they are jurisdictional for every statute that contains commerce elements. Countless statutes do, particularly since the Supreme Court’s decision in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), because that is what justifies congressional action whenever it legislates under its Article I, Section 8 Commerce Clause powers. The majority’s approach therefore has the potential of upsetting far more than the small set of cases that present foreign trade antitrust issues.
I respectfully dissent.

. Today, over 90 countries have competition laws. See, e.g., Diane P. Wood, “International Harmonization of Antitrust Law: The Tortoise or the Hare?” 3 Chicago J. Int’l L. 391, 392 n. 6 (2002). Interestingly, the number of disputes over so-called extraterritorial applications of national laws, whether by the United States, the European Union, or others, has dropped dramatically. Discussions today tend to focus on better ways of coordinating these many national-level regimes, and antitrust authorities around the world are eager to cooperate with one another within the confines established by national confidentiality laws.

. The text and commentary of section 415 is also informative:
§ 415. Jurisdiction To Regulate Anti-Competitive Activities
(1) Any agreement in restraint of United States trade that is made in the United States, and any conduct or agreement in restraint of such trade that is carried out in significant measure in the United States, are subject to the jurisdiction to prescribe of the United States, regardless of the nationality or place of business of the parties to the agreement or of the participants in the conduct.
(2) Any agreement in restraint of United States trade that is made outside of the United States, and any conduct or agreement in restraint of such trade that is carried out predominantly outside of the United States, are subject to the jurisdiction to prescribe of the United States, if a principal purpose of the conduct or agreement is to interfere with the commerce of the United States, and the agreement or conduct has some effect on that commerce.
(3)Other agreements or conduct in restraint of United States trade are subject to the jurisdiction to prescribe of the United States if such agreements or conduct have substantial effect on the commerce of the United States and the exercise of jurisdiction is not unreasonable.
Comment b to this section quotes the FTAIA in full, and goes on to say that "Congress apparently believed that activity whose anti-competitive effects are felt only in foreign slates should not be a concern of United States antitrust regulation, but that activities carried out abroad that have 'direct, substantial, and reasonably foreseeable’ effect in the United States or on the import trade of the United States (as by limiting imports or fixing the price of imported products) should be subject to the Sherman and FTC Acts.”